HURON PORTLAND CEMENT COMPANY *v.* CITY OF DETROIT.

1. COMMERCE—INTERSTATE COMMERCE—CONGRESS—STATES.

  The constitutional grant to Congress of power to regulate interstate commerce, although operating of its own force to curtail State power in some measure, does not forestall all State action affecting interstate commerce, does not withdraw from the States power to legislate in respect of their local concerns, even though such legislation may indirectly or incidentally affect interstate commerce.

2. SAME—INTERSTATE COMMERCE—ORDINANCES.

  Whether or not a local ordinance is in conflict with congressional legislation with respect to interstate commerce is determined by first examining the legislation and then the ordinance to see if it pertains to the same subject matter.

REFERENCES FOR POINTS IN HEADNOTES
[1, 2]  11 Am Jur, Commerce § 20 *et seq.*
[2–7]  37 Am Jur, Municipal Corporations § 295.
[8]  37 Am Jur, Municipal Corporations § 285; 11 Am Jur, Commerce § 20 *et seq.*

3. SAME—SMOKE ABATEMENT ORDINANCE—FEDERAL STATUTE.

A city smoke abatement ordinance, clearly designed for the protection of the health and welfare of the city's residents by preventing the emission of dense smoke into the air which the people must breathe *held*, not in conflict with Federal legislation that was intended primarily for the protection and safety of vessels and their passengers, crew and cargo and not for the protection of persons and property on land, since its effect upon interstate commerce is only indirect and incidental (46 USCA, ch 14; Detroit Ordinance No 167–E).

4. HEALTH—AIR POLLUTION—EXCESSIVE SMOKE—POLICE POWER.

A smoke abatement ordinance setting forth a reasonable standard for measuring the density of smoke and making it unlawful to permit the emission of smoke of a density equal to or greater than such standard is a reasonable exercise of the police power, since excessive air pollution by dense smoke is harmful to the health and welfare of a community (Detroit Ordinance No 167–E).

5. SAME—SMOKE ABATEMENT ORDINANCE.

A smoke abatement ordinance for the protection of health may be said to be reasonable only if it does not unduly hamper industry and the continual need for power, the reasonableness of such an ordinance being a matter of relativity (Detroit Ordinance No 167–E).

6. SAME—SMOKE ABATEMENT ORDINANCE—POLICE POWER.

A city smoke abatement ordinance which seeks to outlaw only the emission of smoke of such density as can readily be prevented by use of modern smoke control equipment is a reasonable exercise of the State's police power in the interest of health (Detroit Ordinance No 167–E).

7. SAME—SMOKE ABATEMENT ORDINANCE—INTERSTATE COMMERCE—VESSELS IN PORT.

A city smoke abatement ordinance that is reasonable will not be inapplicable to vessels in port at such city merely because of the possibility that some other city may adopt an ordinance that is more strict in its requirements, the desirability for uniformity as to vessels engaged in interstate commerce not being operative to strike down an ordinance adopted in the reasonable exercise of the police power in a matter of health (Detroit Ordinance No 167–E).

8. COMMERCE—INTERSTATE COMMERCE—REGULATION BY STATES.

Interstate commerce may be subject to regulation by a local legislative body for the protection of health and welfare in

the proper exercise of the police power and in the absence of supervening legislation in such respect by Congress.

9. COSTS—PUBLIC QUESTION—CONSTRUCTION OF ORDINANCE.

No costs are allowed in suit by owners of vessels engaged in interstate commerce to enjoin enforcement as to them of city smoke abatement ordinance, both a public question and public legislation being involved (Detroit Ordinance No 167–E).

Appeal from Wayne; Bowles (George E.), J. Submitted October 15, 1958. (Docket No. 63, Calendar No. 47,364.) Decided January 12, 1959. Probable jurisdiction noted by the Supreme Court of the United States October 12, 1959.

Bill by Huron Portland Cement Company, a Michigan corporation, against the City of Detroit, a municipal corporation, and certain of its officials to enjoin prosecution under city ordinance relative to smoke abatement. Bill dismissed. Plaintiff appeals. Affirmed.

*Beaumont, Smith & Harris,* for plaintiff.

*Nathaniel H. Goldstick,* Corporation Counsel, and *John F. Hathaway,* Assistant Corporation Counsel, for defendants.

*Amici Curiae:*

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, *Nicholas V. Olds* and *Jerome Maslowski,* Assistants Attorney General, for State of Michigan.

*Hill, Lewis, Andrews, Granse & Adams (Marlin F. Scholl,* of counsel), for Great Lakes Shipowners Association.

*Gilbert R. Johnson* and *Scott H. Elder (Johnson, Branand & Jaeger,* of counsel), for Lake Carriers' Association.

VOELKER, J.  The defendant city of Detroit has a comprehensive ordinance (No 167–E)* entitled "Smoke Abatement Code" which provides that it shall be unlawful within that city to permit the emission of smoke of a density equal to or greater than that described as No 2 Ringlemann Chart (a standard accepted way of measuring the density of smoke).  This ordinance allows certain temporary exceptions which are not now relevant.  It also provides that after an owner has been warned of 3 violations within a 12-month period the comissioner, a city official, shall serve notice on the owners and seal the offending equipment unless he finds that adequate corrective steps have been taken.  It also provides for the inspection of equipment and for fines and imprisonment for failure to comply with the ordinance.

On December 20, 1955, the city of Detroit filed complaints in the traffic and ordinance division of the recorder's court thereof against plaintiff-appellant, owner of the steamships John W. Boardman and S. T. Crapo for allowing the emission of dense smoke at the port of Detroit contrary to the provisions of the ordinance in question.

Appellant then filed suit in circuit court to enjoin the city of Detroit and the other defendants from prosecuting the complaints, and an order was entered granting such an injunction during the pendency of this suit.  Thereafter in circuit court the plaintiff claimed that the ordinance was unconstitutional as to it except in those instances where the objectionable smoke is caused by improper firing or by the improper use of the equipment on the vessel. It is conceded that the vessels operate in interstate commerce.  The trial court held that the ordinance was constitutional and that it was a necessary and

* Detroit Municipal Code (1954), p 510 *et seq.* For preamble, quoted *post,* see separate publication of Smoke Abatement Code.—REPORTER.

reasonable exercise of the local police power. From a decree to that effect plaintiff has appealed.

In the exercise of its constitutional power to control interstate commerce the Congress of the United States has provided for extensive control and inspection of American vessels on the Great Lakes. It is the contention of appellant that by such legislation Congress has pre-empted the field and that therefore the ordinance in question is invalid.

The relationship between State and congressional power to control interstate commerce is well stated in 15 CJS, Commerce, § 11, p 268, as follows:

"However, the constitutional grant to Congress of power to regulate interstate commerce, although operating of its own force to curtail State power in some measure, does not forestall all State action affecting interstate commerce; it does not withdraw from the States power to legislate in respect of their local concerns, even though such legislation may indirectly and incidentally affect interstate commerce. Although State legislation affects interstate commerce incidentally, indirectly, or remotely, yet where it does not undertake to regulate such commerce and is no more than a bona fide, legitimate, and reasonable exercise of the reserved police power of the State in respect of a matter of local or internal concern, it is valid and  *  *  *  will stand, in the absence of conflicting and superseding legislation by Congress in the exercise of its superior authority to regulate commerce among the States."

Appellant's first question on appeal thus falls naturally into 3 parts: 1. Does the ordinance conflict with any Federal legislation? 2. Does it seek to regulate interstate commerce? 3. Is it a reasonable exercise of local police power?

To determine the first part of that question we must look at the scope and intent of the congressional legislation and then examine the ordinance in ques-

tion to see if it pertains to the same subject matter. The Federal legislation cited in appellant's brief, 46 USCA, ch 14, is, so far as we can determine, intended primarily for the protection and safety of vessels and their passengers, crew and cargo. None of the Federal legislation in this field is to our knowledge designed or enacted for the protection of persons and property on land. Appellant has cited none in its brief. (See 1951–1952 OAG, p 370 to the effect that the United States coast guard so interprets the applicable Federal legislation.) It appears to us that the ordinance and the Federal legislation deal with basically different subject matter and are thus not in such conflict that the former must bow.

A quick glance at the title of the ordinance, "Smoke Abatement Code," is sufficient to learn its intent. Even the most casual reading of it indicates clearly that its sole purpose is to protect the health and welfare of the residents of Detroit by preventing the emission of dense smoke into the air which the people must breathe.

Thus paragraphs 2 and 3 of the preamble to the ordinance provide:

"Whereas, the excessive emission of dense smoke within the corporate limits of the city of Detroit and the resultant effect upon the public health and welfare require the adoption of a comprehensive and integrated plan of smoke control; and

"Whereas, in conjunction with the smoke control program it is desirable to adopt appropriate regulations to reduce air pollution caused by excessive soot, cinders, fly ash, dust, noxious acids, fumes and gases, the emission of which is detrimental to the health and welfare of the residents of the city: Now, Therefore."

We think the ordinance before us is clearly aimed at the prevention of air pollution and not at any regulation of interstate commerce. If it affects in-

terstate commerce at all we think it is only indirect and incidental.

Little need be said on the subject of whether or not this ordinance is a reasonable exercise of local police power. We think that by now it is sufficiently clear without citation of authority that excessive air pollution by dense smoke cannot be anything but harmful to the health and welfare of a community. Indeed in 1955 Congress appropriated $5,000,-000 a year for 5 years* for research into and control of the increasingly vexing problem of air pollution. (We also note that the first national conference on air pollution was held in Washington, D. C. during November, 1958. The National Cancer Institute is presently studying the problem but as of this writing has announced no results. See science section of *Saturday Review* for November 8, 1958, p 57.)

We note further that the preamble to the above mentioned congressional appropriation statute says in part:

"It is declared to be the policy of Congress to preserve and protect the primary responsibilities and rights of the States and local governments in controlling air pollution, to support and aid technical research to devise and develop methods of abating such pollution, and to provide Federal technical services and financial aid to State and local government air pollution control agencies and other public or private agencies and institutions in the formulation and execution of their air pollution abatement research programs." 42 USCA, ch 15B, § 1857.†

Regarding this appropriation statute appellant correctly states in its reply brief:

---

* 42 USCA, § 1857d.—REPORTER.

† See, also, executive order No. 10779 of August 21, 1958. 23 FR 6487, 42 USCA, 1958 Cum Supp § 1857.—REPORTER.

"In that act Congress was not attempting to give up its inspection of vessels, locomotives, motor carriers and other things that might conceivably cause or be involved in smoke pollution."

That however is not the question before us. The point is that the ordinance does not seek to supersede or replace any existing provisions of Congress either in the realm of air pollution or for the inspection of vessels, as already noted. Its purpose is simply to control to some extent the emission of unnecessary smoke in a community so as to protect the health and welfare of its inhabitants. The portion of the statute quoted above indicates to this Court that the ordinance in question is not only a reasonable exercise of local police power but that such actions by local authorities have the recent blessing and financial encouragement of Congress itself.

On the other hand we reluctantly realize that the pastoral pine-scented days of yore are gone forever, and that our society has become dependent upon vast conglomerates of power of which smoke is all too frequently an unwanted by-product. Thus the elusive question of the reasonableness of such local legislation boils down to one of relativity. An ordinance of this type may be said to be reasonable only if it does not unduly hamper industry and our continual need for power. It does not follow, however, that if we cannot have smokeless cities that men must compose themselves and dwell in an ever-deepening pall of smoke. If this ordinance sought to prevent the emission of all smoke, or if adequate means of smoke control were not available, then a different question might be before us. But this ordinance concededly seeks to outlaw only the emission of smoke of such density that can readily be prevented by the use of modern smoke control equipment. All it costs is money. We find and hold that the ordinance in question is a reasonable exercise of the local police

power and as such does not unduly interfere with interstate commerce.

Appellant also argues that whether or not Congress has expressly pre-empted the field of smoke abatement, the Detroit ordinance unduly burdens interstate and foreign commerce in matters where uniformity is necessary. Appellant bases its arguments on this score primarily on the fear that local legislation might be inconsistent, that is, that upon meeting Detroit's ordinance it may in the future have to change its equipment again to meet even stricter requirements at some other port. This is a clear possibility we certainly do not deny. We do not see however why *this* ordinance should be held invalid simply because of the possibility that another ordinance might another day be enacted in another place that is even more stringent. Sufficient unto the day is the evil thereof; we will endeavor to cross that smoke-fogged bridge when we come to it. We do not discern it in this case.

As noted, if appellant meets only the minimum requirement of this ordinance it might very well become a burden on it to meet more stringent future requirements as they are enacted. Because of this possibility it would have us strike down the present ordinance. We suggest that such a burden might be avoided if appellant sought to meet the spirit rather than the letter of this present ordinance. This could concededly be done by installing modern equipment and available processes of firing that would reduce smoke to the least possible density. If some future ordinance goes beyond this appellant or someone in its shoes might have a better and a more persuasive basis for a claim of unreasonable burdensomeness.

In an analogous case involving a Georgia statute that required the use of a certain type of headlight on railroad engines, the United States supreme court spoke as follows in answer to arguments strikingly

similar to those presented in this case (*Atlantic C. L. R. Co.* v. *Georgia,* 234 US 280, 291, 292 (34 S Ct 829, 58 L ed 1312):

"In thus deciding, the court applied the settled principle that, in the absence of legislation by Congress, the States are not denied the exercise of their power to secure safety in the physical operation of railroad trains within their territory, even though such trains are used in interstate commerce. That has been the law since the beginning of railroad transportation. It was not intended that, pending Federal action, the use of such agencies, which, unless carefully guarded, was fraught with danger to the community, should go unregulated, and that the States should be without authority to secure needed local protection. The requirements of a State, of course, must not be arbitrary, or pass beyond the limits of a fair judgment as to what the exigency demands, but they are not invalid because another State, in the exercise of a similar power, may not impose the same regulation. * * *

"If there is a conflict in such local regulations, by which interstate commerce may be inconvenienced,— if there appears to be need of standardization of safety appliances, and of providing rules of operation which will govern the entire interstate road, irrespective of State boundaries,—there is a simple remedy; and it cannot be assumed that it will not be readily applied if there be real occasion for it. That remedy does not rest in a denial to the State, in the absence of conflicting Federal action, of its power to protect life and property within its borders, but it does lie in the exercise of the paramount authority of Congress, in its control of interstate commerce, to establish such regulations as, in its judgment, may be deemed appropriate and sufficient. Congress, when it pleases, may give the rule and make the standard to be observed on the interstate highway."

We concede that this subject is one that might well call for uniform legislation of Federal scope, but until that happens we are not persuaded that our citizens must patriotically gag, choke and grope with obedient resignation until that happy day arrives. Nor are we persuaded that short of any such uniform legislation that local governments are in the meantime powerless to make a proper exercise of their police power.

Appellant cites *McMorran* v. *Cleveland-Cliffs Iron Co.*, 253 Mich 65, where this Court reversed that portion of the chancellor's decree below restraining as a nuisance the smoke from the stacks of certain coal-burning lake vessels while tied up at a coaling dock at Port Huron. No smoke ordinance was there involved; the opinion does not indicate that further smoke abatement was there readily available; the plaintiff householders there had moved into the area after these conditions had already long existed; and the smoke from the lake vessels was but a fraction of the general smoke, soot, dust and noise which had long existed, emanating mostly from stationary industrial installations. Our opinion there indicates that the smoke from the vessels was but a reasonable incident of navigation. That case and others cited by appellant are not controlling of our decision here.

The judgment below is affirmed, but without costs, both a public question and public legislation being involved.

DETHMERS, C. J., and CARR, KELLY, SMITH, BLACK, EDWARDS, and KAVANAGH, JJ., concurred.